## Commissioners of Sewerage of Louisville, et al. v. Gates.

(Decided June 4, 1914.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, Second Division).

Equity—Priority of Equities—Assignment—Waiver.—In an action involving priority of equities between the surety of a contractor and Gates who loaned the contractor money to meet his pay rolls, taking an assignment of certain amounts to be retained by the city that let the construction work, the evidence showing that if the loan had not been made the surety company, under the terms of its contract, would have been compelled to pay it, and that it had not only notice of the security taken by Gates, but in fact induced and directed it, whatever equities the surety company may have ever had with reference to the fund in question, these facts are sufficient to be deemed a waiver on its part of Gates, and he was properly adjudged a prior lien on the fund in controversy.

WILLIAM W. CRAWFORD, JOHN J. DAVIS for appellants.

WEHLE & WEHLE for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

E. A. Barker & Son, under contract with the Sewerage Commission of Louisville, were constructing certain sewers. During the course of the work, and at or about its completion the events transpired which gave rise to this controversy. It has resolved itself into a question

of priority of equities between the National Surety Company and the appellee, Gates. The Surety Company signed as surety the several contracts entered into by Barker for the sewerage construction. During the course of the work, Gates loaned to Barker $4,000 to meet his pay rolls, and it was so used. For security of the loan Gates took a written assignment of certain amounts *to be retained* by the city under the contract, while the Surety Company claims the benefit of these same amounts by virtue of its right of subrogation and also by prior written assignment from Barker. The assignment from Barker to Gates is as follows:

"For value received, the undersigned, E. A. Barker and K. A. Barker, partners doing business under the firm of E. A. Barker & Son, hereby assign, transfer and set over unto H. J. Gates and J. F. Gauvreau certain rights or claims which E. A. Barker & Son have against the Commissioners of Sewerage of Louisville, Kentucky, by virtue of money retained payable by said Commissioners to E. A. Barker & Son, under the terms and conditions of certain contracts for construction of certain sections of sewers in Louisville, Kentucky, designated as follows: No. 10 Bismarck Avenue Sewer, said amount retained being $221.38; No. 11 Magazine Street Sewer, said amount retained being $151.91; No. 13 Elliott Avenue Sewer, said amount retained being $157.35; No. 19 Crescent Avenue Sewer, said amount retained being $345.94; Northeastern Sanitary Sewer, said amount retained being not yet definitely ascertained; Jefferson Street Sewer, amount retained being not yet definitely ascertained:

"Dumesnil Street Sewer, amount retained being not yet definitely ascertained.

"Receipts from the Commissioners of Sewerage for said sums of $221.38, $151.91, $157.35, and $345.94 numbered as aforesaid are hereby attached as part hereof.

"Provided, however, that this assignment is made only to secure the payment of three (3) notes executed by E. A. Barker & Son to H. J. Gates and J. F. Gauvreau, one dated January 21, 1910, for One Thousand ($1,000) Dollars, one dated January 28, 1910, for One Thousand ($1,000.00) Dollars, and one dated February 4, 1910, for Two Thousand Dollars ($2,000.00), all payable on or before September 1st, 1910, and if said E. A. Barker & Son shall fully pay said notes, this assignment shall be void, and said Gates and Gauvreau will release all interest

in said moneys or rights; and it is agreed that said assignee will also return the receipts or evidence of said rights upon payment of said notes by either said Gates or said Gauvreau.

"In testimony whereof, witness the signatures of E. A. Barker and K. A. Barker, this 21st day of January, 1910. E. A. Barker & Son, Edward A. Barker, Kenneth A. Barker."

Subsequently, Gauvreau transferred to Gates all his rights in the loan and assignment, and Gates is the sole party interested. The only sums in controversy are those with reference to the Dumesnil Street, Jefferson Street and Northeastern Sanitary Sewer. The assignments with reference to the sewers on Bismarck Avenue, Magazine, Elliott and Crescent Avenues were collected without trouble, and are not involved in this suit.

The contract between the city, on the one part, and Barker and the Surety Company, on the other, is voluminous, but it seems to be agreed that Articles 20 and 22 are the only parts of it material. Article 20 is as follows:

"The commission may keep any moneys which would otherwise be payable at any time hereunder, and apply the same, or so much as may be necessary therefor, to the payment of any expenses, losses or damages incurred by the City or the Commission, and determined as herein provided, and may retain, until all claims are settled, so much of such moneys as the Commission shall be of the opinion will be required to settle all claims against the City and the Commission and their officers and agents, and all claims for labor on the work, and also all claims for materials used in the work, or the Commission may make such settlements and apply thereto any moneys retained under this contract. If the moneys retained under this contract are insufficient to pay the sums found by the Commission to be due under the claims for labor and materials, the Commission may, at its discretion, pay the same, and the contractor and surety shall repay to the Commission all sums so paid out. The Commission may also, with the written consent of the Contractor, use any moneys retained, due or to become due under this contract for the purpose of paying for both labor and materials for the work, for which claims have not been filed in the office of the Commission. While it is understood that the security required to be given by the Contractor is furnished by the Contractor by his giving the

bond accompanying this contract, the Commission may, nevertheless, if it shall deem it just and equitable so to do, cause any moneys retained due or to become due, to be held and applied to the payment for labor or materials furnished or supplied by said Contractor, but for which he has not made payment in full. The Contractor shall, at such times as moneys are payable hereunder, deliver, to the engineer a sworn statement, showing as to that date the amount owing by him for material furnished and labor performed.''

Article 22 is too long for space in this opinion, but, in substance, it provides that the city engineer shall, in order that the contractor may receive part pay for the work as it progresses, make estimates once a month, or oftener if the interests of the city require, of the quantity and value of work done. In arriving at the value, up to the time the excavation is completed and ready for the concrete, the engineer will estimate 70 per cent of the contract prices, the remaining 30 per cent will be estimated after the concrete is laid and the trench or tunnel back filled. When these estimates from time to time are made the Commission will pay to the contractor the amount thereof, *less* 15 *per cent, which shall be retained* until the work is completed, as part security for the fulfillment of the contract. It is optional with the Commission to retain smaller amounts, or it may pay the contractor any portion of the amount retained as it may deem prudent. All of these provisions have reference to a time while the construction work is in progress; but when the work is completed, the engineer shall make a final estimate, and within thirty days after the final estimate is made and approved by the commission, the contractor is entitled to receive all of his contract price. Then follow other clauses with reference to guaranty of materials used in the work. In effect, the contractor guarantees that the material used in the construction is free from defects or flaws, and this guaranty is for a term of one year from the date when the estimate of the engineer is formally approved by the commission. When the engineer's estimate is approved, the contractor agrees to deposit with the commission bonds of the City of Louisville or the United States Government amounting in the aggregate to 6 per cent of the contract price of the work. Should any defect in the work or materials become apparent during the one year guaranty period, then the contractor, on notice, will repair same, and on fail-

ure so to do, the commission may make the repairs, and, in that event, to meet that expense, the commission may sell the bonds, or as many of them as may be necessary. At the end of the year the bonds, or the unexpended balance, shall be subject to the order of the contractor.

In April and May, 1910, the three sewers were completed, and final settlement made between the city and the contractor. Pursuant to the contract, and for guaranty of the work and materials used, Barker then deposited with the Commissioners $306.48 on the Jefferson Street sewer, $720.78 on the Dumesnil Street sewer, and $255.18 on the Northeastern sanitary trunk sewer. It is intimated in appellee's brief, and not questioned by the appellant, that the amounts to be deposited were less than the denominations in which city and government bonds were issued, and for that reason the commissioners accepted in lieu of bonds, certified checks drawn on a Louisville bank. It makes no difference in this case, for the checks were good, and they, or their proceeds are still in the hands of the commissioners, and the only question here is, who is entitled to same, Gates or the Surety Company?

It is conceded that the workmanship was good, and that there was no flaw or defect in the material used, and during the year no repairs were necessary on any of the sewers, and no expense was in fact incurred by the commission on their account. Therefore, there was no breach of the warranty.

At the end of the year from the completion of the contract, and the deposit of the checks, there was still unpaid about $3,000 of the notes executed by Barker to Gates. Gates asked the commissioners to surrender to him, pursuant to the Barker assignment, the three certified checks, or their proceeds. This being refused, Gates instituted the action. The commissioners answered that the National Surety Company was interested, and prayed that it be made a party. The commissioners also averred that when they made a final settlement with Barker, it was on the faith of his sworn statement to the engineer that he had fully paid for all labor and materials used in the work, and that this statement was false. It appeared from subsequent pleadings that there were unsatisfied claims for material on each of the three sewers and that they were in excess of the amounts which Barker had deposited as guaranty against flaw or defect in the work or material. These material men never filed

any liens, but the commissioners and the Surety Company paid them anyhow.

As to the National Surety Company's reliance upon a written assignment prior in date to that of Gates, we are not sure that we quite understand the facts upon which it bases it. No such assignment is filed with, or made a part of the pleadings. We quote from the only averment as to any articles of assignment, but we assume that it has reference to the provisions of Article 20. It alleges, that as such surety, it became bound with Barker for the faithful performance of the contracts, and with Barker in each contract it "agreed and bound itself to well and truly keep and perform all the agreements, terms and conditions of said contract on the part of its principal to be kept and performed, and also to pay for all labor performed and furnished, and for all materials used in the carrying out of said contract, and in consideration of its becoming so bound, and undertaking to, and agreeing to carry out the stipulations and agreements of said contract, and to pay for all labor furnished and material furnished to E. A. Barker & Son in the construction of said sewers, said E. A. Barker & Son assigned, by writing, to it, all the amounts *to be received* by said E. A. Barker & Son under said contracts."

Where the assignment is, if there be a separate one, or what were its terms or conditions, we are left to surmise. Some parts of its pleading seem to show that the assignment which it relies upon is in reality a right of subrogation under Article 20 of the contract, above quoted, but in either event, and accepting its construction of the article, that is, that it has a prior claim "on all amounts *to be received* by Barker under said contract," we think its claim, or security clearly has reference to the 15 per cent to be deducted during the course of construction from the engineer's estimates, and retained by the Commission until the work is completed. The amounts in controversy are sums paid or deposited by Barker after final settlement of the amounts to be received by him from the commissioners. The amounts that he was to receive from the commissioners, as contemplated in Article 20 were those retained from time to time to secure labor and material men's claims, in other words, the 15 per cent retentions. Gates does not claim his assignment covered these 15 per cent retentions. If he did, and if it was established that the sums in controversy were of that character, we would hold, notwithstanding any

assignment to Gates, that the Surety Company had a prior claim by reason of its right of subrogation. As we understand the two articles, the commission must look to the Surety Company for performance of the obligation with reference to the construction work, and to the 6 per cent deposit for security against any flaw or defect in the materials or workmanship.

A fair construction of the Gates' assignment shows that the phrase, "amount retained," frequently used in it, embraced nothing but the contemplated 6 per cent deposits subsequent to the completion of the work. The plaintiff in his petition makes this direct statement, and it is never denied.

We are of opinion that the lower court properly construed the contract when it held that the 15 per cent to be retained by the commission during the course of construction, and the 6 per cent deposit required after the completion of the construction work, although contained in one contract, are different obligations, and are entirely separate and independent of each other.

Appellant insists that the cases of Prairie State Bank v. United States, 164 U. S., 228, and Henningsen v. U. S. Fidelity & Guaranty Co., 208 U. S., 404, apply to this case, and control it. We are unable to take the same view of it. In the Prairie Bank case Sundberg was building a custom house at Galveston for the United States Government, with one Hitchcock as surety for the faithful performance of the contract. After the work had progressed to some extent, and in consideration of loans and advances made by the bank, Sundberg gave to the bank a power of attorney authorizing it to receive from the government the final payments under the contract. By the terms of the contract, the government made advancements to Sundberg upon engineer's estimates in the meantime, but retained 10 per cent of the estimates until final settlement. Subsequently, Sundberg defaulted on the contract, and Hitchcock, the surety, was compelled to take over the work and complete it, and in that way disbursed or lost about $15,000 in excess of current payments from the government. The question at issue was the right as between Hitchcock and the bank to the 10 per cent retained by the government on the construction work from the estimates made for Sundberg.

In the Henningsen case the situation was exactly the same except that the contractor did complete his work, but failed to pay some material men, and his surety was

compelled to pay them. It will be noticed that the fund in controversy in these two cases was the per cent which, under the contract, was to be retained by the government from the engineer's estimates until the work was completed, to secure the government against labor and material men's claims. By the building contract in each case, on final settlement, the government was obligated to account for the sums retained.

In the case at bar the fund in controversy does not arise in any such way. The sums retained by the commission as security for labor and materials were paid to Barker at the time final settlement was made. The "sums retained" which the parties here are seeking, were amounts paid or deposited by Barker as security for another and independent part of the contract. As to the amounts retained during the course of construction, there can be no doubt that the surety, by right of subrogation, if nothing more, has a prior equity. The rule is well expressed in Henningsen case, *supra,* which reaffirms the principles laid down in the Prairie State Bank case, *supra,* as follows:

"The Guaranty Company was surety on that contract. Its stipulation was not merely that the contractor should construct the buildings, but that he should pay promptly and in full all persons supplying labor and material in the prosecution of the work contracted for. He did not make this payment, and the Guaranty Company, as surety, was compelled to and did make the payment. Is its equity superior to that of one who simply loaned money to the contractor to be by him used as he saw fit either in the performance of his building contract or in any other way? We think it is. It paid the laborers and material men and thus released the contractor from his obligation to them, and to the same extent released the government from all equitable obligations to see that the laborers and supply men were paid. It did this not as a volunteer, but by reason of contract obligations entered into before the commencement of the work."

But aside from the matter of whether the Surety Company had a distinct assignment of prior date to that of Gates, and whether the construction contract is separable as to the 15 per cent and 6 per cent sums retained, the facts attending the procurement of this loan from Gates, and the part taken in it by the Surety Company, we are inclined to believe, are sufficient to estop it from

now asserting priority. It is proven beyond controversy, and undenied, that Barker was getting behind, and the work was about to be thrown on the Surety Company, and to avert this, and aid Barker, the Surety Company's General Agent approached Gates, and arranged for the $4,000.00 loan, and even prepared the written assignment to Gates which is relied upon in this case by him, and secured Barker's signature to it. During the next three weeks, as money was needed to meet the pay rolls, the Surety Company's agent prepared the notes, obtained Barker's signature, took them to Gates, secured the money, and looked after the application of same in the way of paying for labor and material. So it is plain that every penny of this money went into the construction work, and in that way the Surety Company got the benefit of it. If the loan had not been made, the Surety Company, under the terms of its contract, would have been compelled to pay it. It not only had notice of the security taken by Gates, but, in fact, induced and directed it. Whatever equities the Surety Company may have ever had with reference to the fund in question, these facts are certainly sufficient to be deemed a waiver on its part in favor of Gates.

The judgment of the lower court is therefore affirmed.