RAY F. BOWER and GERALD RYAN, Plaintiffs and Respondents, *v.* CAL M. TEBBS, Doing Business Under the Name and Style of Cal M. Tebbs Construction Co., and the Employer's Liability Assurance Corp., Ltd., a Corporation, Defendants and Appellants.

Nos. 9470, 9471.
Submitted May 14, 1957. Decided August 21, 1957.
314 Pac. (2d) 731.

Messrs. Toomey & Hughes, Helena, for appellants.

Mr. Ralph J. Anderson, Helena, Mr. George P. Sarsfield, Butte, Mr. Stanley P. Sorenson, Helena, for respondents.

Mr. Hughes, Mr. Anderson and Mr. Sarsfield argued orally.

MR. CHIEF JUSTICE HARRISON:

These cases come up on appeal by Cal M. Tebbs, an individual doing business under the name and style of Cal M. Tebbs Construction Co., and the Employer's Liability Assurance Corp., Ltd., a Corporation, defendants, from a judgment of the district court of Lewis and Clark County in favor of each of the plaintiffs, Ray F. Bower and Gerald Ryan, in two actions, consolidated for trial and tried to the court sitting without a jury. Both cases grew out of several claims of the plaintiffs (four by plaintiff Ryan and one by plaintiff Bower) against a contractor, Cal M. Tebbs, which claims arose during the performance by the contractor Tebbs of a contract with the State Highway Commission of the State of Montana for the construction by Tebbs, of a certain section of highway in Madison County, Montana. The codefendants in each action, the Employer's Liability Assurance Corp., Ltd., is the surety on the bond given by the contractor to the State of Montana pursuant to the provisions of R.C.M. 1947, section 6-401.

It is alleged in the complaint filed by each of the plaintiffs, and admitted by the separate answers filed by each of the defendants, that on or about November 17, 1949, Tebbs entered into a contract with the State Highway Commission of the State of Montana, whereby Tebbs agreed to construct a described section of highway in Madison County, Montana. The complaint set forth, and the answers admit that on or about the same date, the Employer's Liability Assurance Corp., Ltd., entered into a bond in writing as required by R.C.M. 1947, sections 6-401 to 6-404, inclusive. The condition of said bond being as follows:

"Now, Therefore, the condition of this obligation is such that if the above bonded 'Principal' as Contractor shall in all respects faithfully perform all of the provisions of said contract, and his, their or its obligations thereunder including the specifications therein referred to and made part thereof and such alterations as may be made in said specifications as therein provided for and shall well and truly, and in a manner satisfactory

to the State Highway Commission, complete the work contracted for, and shall save harmless the State of Montana, from any expense incurred through the failure of said Contractor to complete the work as specified, or from any damages growing out of the carelessness of said Contractor or his, their, or its servants, or from any liability for payment of wages due or material furnished said Contractor, and shall well and truly pay all laborers, mechanics, subcontractors and material men who perform work or furnish material under said contract, and all persons who shall supply him or the subcontractor with provisions, provendor and supplies for the carrying on of the work, and also shall save and keep harmless the said State of Montana against and from all losses to it from any cause whatever including patent, trademark and copyright infringements, in the manner of constructing said section of work, then this obligation to be void or otherwise to be and remain in full force and virtue.''

Each of the plaintiffs, Bower and Ryan, alleged that during the construction work, ''numerous persons performed work and labor in the construction of said road and highway and drainage structures and that numerous other persons furnished to the defendant Tebbs provendor, materials, supplies, provisions and goods in the prosecution of such work and the making of such improvements and that after the work was done by such persons and after provendor, materials, supplies, provisions or goods which were furnished in the prosecution of the work and making of the improvements this plaintiff advanced to such persons amounts due and owing to them for such work, provendor, materials, supplies, provisions and goods from the said Tebbs and that such amounts of cash so advanced as herein alleged and set forth was done with the knowledge and consent of these defendants and that thereby and by reason thereof the plaintiff became in equity the assignee of all such claims as hereinabove mentioned of the persons to whom such advancements were made and thereby became subrogated to all of the rights of such persons as against these defendants.''

In addition, plaintiff Ryan alleged that he, Ryan, during the construction of said road and the performance of said contract, ''performed certain services personally which entered into the construction of said road and the performance of said contract; that he rented to the defendant Tebbs certain equipment for the performance of said contract and used in the construction of said highway and road for which the said Tebbs agreed to pay the rental value of the use of said equipment * * *.''

These allegations were denied by the answer of each of the defendants. Plaintiff Bower alleged he advanced the sum of $8,000 to the persons who furnished to Tebbs provender, materials, supplies, provisions and goods and sought recovery of this sum, plus attorneys' fees.

Plaintiff Ryan alleged that the money due, as a result of the services he performed, the rental due on equipment by him furnished, and the advancements by him made to the persons who performed work and labor, and the persons who furnished to Tebbs provendor, materials, supplies, provisions and goods, was $14,682.83, and prayed recovery of this sum, plus attorneys' fees.

The actions were tried to a court sitting without a jury on January 18, 1954. The evidence adduced at the trial showed that Bower was then, and at all times material to this action had been, president of the Farmers State Bank of Worland, Wyoming. He knew Tebbs since about 1946. Bower also knew one Donald Scheib who was the attorney-in-fact for the Employer's Liability Assurance Corp., Ltd. Ryan was employed by Tebbs as a foreman on the highway project here involved.

After the contract had been let and the bond executed on November 17, 1949, Tebbs and Ryan each worked on the job, until the job was closed down about January 10, 1950. About that time Tebbs' financial difficulties commenced. Between January 16, 1950, and February 4, 1950, Bower's bank paid some sixty-one checks totaling some $5,086.98, drawn against Tebbs' account with Bower's bank, the bank extending credit

to Tebbs on his note to cover these checks. These checks as introduced into evidence were all marked paid.

However, more checks drawn against Tebbs' account had been presented to Bower's bank for payment and some had been returned twice for insufficient funds and Bower testified that, "The Bank at Sheridan had given this notice they would no longer cash checks drawn on the Farmers State Bank because of the difficulties they had with short checks and that any further checks they cashed for payrolls would have to be paid out of funds which would be placed in their bank." Bower testified that on or about February 17, 1950, (this date is open to some conjecture) his bank was unwilling to advance further credit to Tebbs, and that at that time there was $8,000 in checks drawn against Tebbs' account outstanding and unpaid, but which were in his bank on that date.

Bower, Tebbs and Ryan all convened in the bank as of the date the bank held the $8,000 in unpaid checks to discuss a solution to the problem faced by Tebbs. Tebbs and Ryan concluded it would require an additional $6,500 to complete the job. Thus at this time Tebbs was faced with three distinct financial problems: (1) There was $5,086.98 in checks which had been paid and which Tebbs had covered with his note to the bank; (2) There were other checks drawn by Tebbs totaling about $8,000, which were still unpaid; (3) There was the problem of raising $6,500 to complete the job.

Bower then called Scheib, the surety's attorney-in-fact, in Denver, Colorado. Bower explained the situation to him, and indicated that if nothing was done about the unpaid checks, the bank would return them again. Bower then asked Scheib if it would be possible for him, Bower, to purchase the $8,000 worth of checks, Scheib said it would be all right. Bower asked Scheib if it would be necessary for him, Bower, to take an individual assignment from every one of the holders of the checks, and he said he didn't think it would be necessary. He thought if Bower purchased the checks that he would stand in the position of the claimants.

Bower testified that it was his idea when he picked up the checks that he would be in the position of the individual claimants themselves; this conclusion being based upon the representation of Scheib, who said he did not think it necessary to get assignments from each one. He also testified that Scheib and he discussed the further financing of the project, and it was agreed that Ryan would pick up the note of Tebbs for the $5,000 credit extended to him under the former dealings and that he would also extend a loan to Tebbs for $6,500 to complete the job, this latter sum for the purpose of paying future payrolls. Bower testified that Scheib had agreed to this arrangement, and had indicated that Ryan would occupy the same situation as the individual laborers or materialmen under the bond. Scheib never spoke directly with Ryan. It should be added that with respect to the $5,000 worth of paid checks covered by Tebbs' note, there was no testimony that Scheib made any direct representation that Ryan would be protected on this amount. However, Bower's testimony does show that he did realize that $6,500 was the estimate of completing the job; that Tebbs could not get the credit to complete it; that Ryan would pay the payrolls as they accrued up to $6,500; that Scheib said this would be all right; that both Ryan and Bower thought these checks would also place them in the shoes of the individual payees. It was further shown that Ryan had in fact covered $6,500 worth of checks which had been paid out by the Tebbs Construction Company in furtherance of the contract after the telephone conversation.

Ryan testified that he rented equipment to Tebbs for use on the job, and that he had not been paid for the rent of that equipment; the rent on these machines totaling some $2,755. Also that he had not been paid for labor performed for Tebbs in the amount of $454.76. Unpaid checks totaling this amount were introduced and admitted into evidence.

Scheib's testimony was introduced in the form of a deposition taken in Denver. He testified that he and Bower did have a telephone conversation the latter part of February 1950;

that Bower had mentioned something about $8,000 worth of checks and that Tebbs was in financial trouble, but denied making any representation to the effect Bower would stand in the shoes of the individual claimants if he, Bower, purchased the checks. His memory was very hazy about the telephone conversation, and he could not remember any other details.

Tebbs did not testify as to the telephone conversation with Scheib, only that in the office of Bower it was agreed that further financing would be required to take care of the job, and arrangements to handle the situation were made as outlined by Ryan and Bower.

The court then rendered a judgment for Bower and Ryan for the full amounts of five separate and distinct claims:

1. Bower's claim for $8,000 on the checks paid subsequent to the telephone conversation with Scheib.

2. Ryan's claim for $5,000 on the checks paid prior to the telephone conversation with Scheib.

3. Ryan's claim for $6,500 on the checks which he paid after the telephone conversation with Scheib.

4. Ryan's claim for equipment rentals in the amount of $2,755.

5. Ryan's claim for labor performed in the amount of $454.76.

Although the defendants raise twenty-three specifications of error, they seem to devolve into three distinct headings: (1) Were Ryan and Bower subrogated to the claims of the payees of the checks comprising the totals, $8,000, $5,000 and $6,500? (2) Are certain of the checks included in the totals set out in (1) above properly allowable as claims under the bond? (3) Are equipment rentals properly allowable as claims under the bond?

This court will consider these issues in the above order.

Plaintiffs' complaints and prayers for relief were based upon the theory that, they, by purchasing the checks pursuant to the representation of Scheib, would stand in the shoes of the

154

laborers and materialmen, and therefore would become equitable assignees of the checks subrogated to the rights of the laborers and materialmen protected by the bond.

Defendants in contending that plaintiffs were not entitled to subrogation rely upon: (a) R.C.M. 1947, section 6-401, which in requiring a bond be supplied by anyone performing work for the state, provides that the bond shall be conditioned upon the contractor paying all materialmen and laborers who supplied the contractor for carrying on the job and, further that the provisions of the act should not apply to money loaned or advanced to any such contractor in the performance of such work. (b) Even in cases not governed by a statute, the general rule is that a claim for money loaned or advanced to a contractor is not within the coverage of his bond, even though the borrowed money has been wholly applied to the cost of labor and material actually going into the construction project.

Although defendants set up several separate arguments which would purportedly negative plaintiffs' rights to subrogation, all of them fit neatly under the above headings.

In support of (a) supra, defendants argue that the provisions of the surety's bond, and the scope of its protection, are no wider than the scope of the statute pursuant to which it was executed. However we find this argument without merit. The purpose of the statute was to protect laborers and materialmen who supply contractors working on state projects. Gary Hay & Grain Co., Inc., v. Carlson, 79 Mont. 111, 255 Pac. 722. The purpose of the statute was to protect those who otherwise would not be protected. Therefore, in providing that the statute did not cover loans or advances, the legislature did not intend to supplant private agreements or contracts between the parties, but rather was merely setting up the minimum requirements under the bond. In other words the bond could be conditioned upon payment of loans if the parties wished it to be, but this was not required by the act—the act did not forbid those provisions being included, only that they were not required. Therefore plaintiffs'

right to subrogation is not conditioned upon the statute but upon subsequent circumstances or upon what the parties subsequently agreed.

Concerning the nature of the doctrine of subrogation it is ▓ said:

"The object of subrogation is the prevention of injustice. It is designed to promote and to accomplish justice, and is the mode which equity adopts to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it. It is an appropriate means of preventing unjust enrichment. The doctrine of subrogation is applied to subserve the ends of justice, to do equity in the particular case under consideration, and to prevent fraud or relieve from mistake." 83 C.J.S. Subrogation section 2c, pages 581, 583.

In the same work and title, section 3, pages 584, 585, is ▓ found the following statement:

"The right of legal subrogation is not a matter of contract; it does not arise from any contractual relationship between the parties, but takes place as a matter of equity, with or without an agreement to that effect. The right of legal subrogation is not dependent on privity nor is it founded on, or dependent on, contract or on the absence of contract, but is independent of any contractual relations between the parties. Likewise, the right does not depend on the act of the creditor, but may be independent of him and also of the debtor. However, although the right of subrogation does not flow from a contract expressed or legally implied, it may be dependent on a contract in the sense that it may grow out of conditions resulting from the due observance of a contract."

The general rule under subrogation is that a claim for money ▓ loaned or advanced to a building or construction contractor is not within the coverage of the ordinary form of contractor's bond conditioned upon the performance of the contract and the payment of claims for labor and material, even though the borrowed money has been wholly applied to the payment of the cost of labor and material actually going into

the construction project. See Annotation, 127 A.L.R. 974, and cases cited therein. It has also been generally held that if a person loans or advances money to a contractor which is actually used for paying laborers and materialmen, or the person himself actually pays the laborers and materialmen without an assignment of their claims, he cannot recover from the surety on the basis of legal or equitable subrogation. 127 A.L.R. 989, 992, and cases cited therein.

However, none of the cases cited in the annotation in 127 A.L.R. or in defendants' brief deal with the situation which arises when the surety has knowledge of the loan or advance, or the situation where the surety induces the loan or acquiesces to it; or where he makes representations to the effect that the lender will stand in the position of the claimant, and therefore the above rules and cases are wholly inapplicable to the present case.

The Kentucky case of Western Casualty & Surety Co. v. Meyer, 301 Ky. 487, 192 S.W. (2d) 388, 391, 164 A.L.R. 769, deals with a factual situation almost identical to the instant case. In the Western Casualty case the plaintiff had advanced $72,000 to her husband, a subcontractor, and sought recovery of that amount of his bond. The money was used for the purpose of paying claims for labor and materials. In that case, as here, the plaintiff had conferred with the agent of the surety company, and the plaintiff testified that the company's agent advised her to advance the money and assured her that she would be protected under the bond. The agent denied that he had so advised or so assured the plaintiff. In holding that the plaintiff was entitled to the benefit of the doctrine of equitable subrogation the court said:

"Equity is the same everywhere. The traditional principles are not confined to Indiana or Kentucky. They are universal in English and American Jurisprudence. True, there are differences in the conclusions or application among the courts and even among their respective decisions. * * *

"One of the factors entering into the differences of judicial

opinion and upon which the decisions turn is that relating to the status of the person seeking to be subrogated with respect to his being a ·volunteer. His payment must not be a purely voluntary act, but must be made by or on behalf of a person who had some interest in the claim. Pomeroy's Equity Jurisprudence, Section 1212, 1419. * * * The plaintiff in the case at bar certainly cannot be deemed a volunteer or intermeddler under any interpretation or application by any court. As said in 50 Am. Jur., Subrogation, Sec. 22: 'One is not a volunteer within the rule here considered where he pays the debt at the instance, solicitation, or request of the person whose liability he discharges, or of that person's agent or representative'.

"Indeed, the evidence in the present case almost, if not altogether, establishes the right to a conventional subrogation, i. e., one arising from some understanding or agreement, express or implied. 50 Am. Jur., Subrogation, Sec. 4. The only doubt rests on the questionable authority of the agent representing the company to affirmatively bind the company. That it may be said parenthetically, is different from his knowledge of what was being done under the contract which knowledge is deemed to be that of his company. Liability is almost imposed by the doctrine of estoppel. In any event, these factors greatly fortify the plaintiff's right to an equitable or legal subrogation, for they make a strong appeal to a sense of justice."

Although no statute was involved in the Western Casualty ▮ case, we do not feel that the provisions of the statute in any way limit the applicability of the reasoning in that case. As pointed out by that court the principles of equity and justice are universal and are not confined to one jurisdiction or court. We can find only one case which denies recovery under a fact situation similar to the present case, Audrain County ex rel. and to Use of First National Bank of Mexico v. Walker, 236 Mo. App. 627, 155 S.W. (2d) 251. However, in that case there were no affirmative representations made by the surety

158

to the bank to the effect the bank would stand in the shoes of those covered by the express terms of the bond.

In McClelland v. New Amsterdam Casualty Co., 322 Pa. 429, 185 A. 198, a general contractor paid materialman's claim against his subcontractor, and was allowed to succeed to the materialman's rights against the surety on the subcontractor's performance bond. See also, Camdenton Consol. School Dist. No. 6 of Camden County ex rel. W. H. Powell Lbr. Co. v. New York Casualty Co., 340 Mo. 1070, 104 S.W. (2d) 319; Southern Exchange Bank v. American Surety Co., 284 Ky. 251, 144 S.W. (2d) 203; Movl Const. Co. v. Covington Trust & Banking Co., 258 Ky. 485, 80 S.W. (2d) 560; Commissioners of Sewerage of Louisville v. Gates, 159 Ky. 391, 167 S.W. 417.

While there are few cases dealing with the exact fact situation involved in the instant case, there are many cases which, while denying recovery, take special notice of the fact no notice of the loan was given to the surety, or he was aware of the transaction only after it was entered into. Lack of knowledge on the part of the surety was given special attention in the following cases: New Amsterdam Casualty Co. v. State, 147 Md. 554, 128 A. 641; Paxton v. Spencer, 71 Utah 313, 265 Pac. 751; Lion Bonding & Surety Co. v. First State Bank of Paris, Tex. Civ. App., 194, S.W. 1012; Employers' Casualty Co. v. City of Wolfe City, 119 Tex. 552, 25 S.W. (2d) 320, affirmed on rehearing 119 Tex. 552, 35 S.W. (2d) 694; Carr Hardware Co. v. Chicago Bonding & Surety Co., 190 Iowa 1320, 181 N.W. 680; Neodesha Nat. Bank v. Russell, 109 Kan. 562, 200 Pac. 281.

Based upon the preceding authority this court finds that Ryan and Bower bring themselves within the rule of the Western Casualty case, supra. To decide otherwise would allow the surety to be unjustly enriched at the expense of the plaintiffs. There is no doubt that the surety would have been liable had Bower and Ryan obtained assignments from the payees of the checks. Third National Bank of Miami v. Detroit Fidelity & Surety Co., 5 Cir., 65 F. (2d) 548, certiorari denied 290

U.S. 667, 54 S. Ct. 88, 78 L. Ed. 577; Southern Surety Co. v. People's State Bank, 4 Cir., 47 Cir., 47 F. (2d) 93, 127 A.L.R. 974, and cases cited therein.

The only reason Bower and Ryan did not obtain assignments from the individuals protected by the bond was because Scheib, the attorney-in-fact for the surety, stated that this was unnecessary, therefore, this court finds any other result repugnant to the underlying tenets of equity. The very purpose of subrogation is to prevent unjust enrichment; to protect those without an adequate remedy at law. The situation involved in this appeal is just that sort of situation equity has been shaped to remedy.

However in affirming the judgment of the trial court, we must amend and modify that judgment so as to do equity to both parties. The $5,000 note of Tebbs, which Ryan picked up by giving Bower a check for that amount, does not come within the purview of the Western Casualty case, or those cases holding the same rule. The $5,000 worth of checks which Ryan purchased were already paid by the bank when it extended credit to Tebbs. These claims were not alive to harass the surety for they had been paid by Tebbs using the bank's money. This is just the type of situation in which equitable subrogation will not be granted because the bank is a mere volunteer or intermeddler. See cases cited in 127 A.L.R. 974, 989-992. The bank did not extend the $5,000 credit on the strength of any assertion of Scheib; nor did Scheib have any notice of the credit having been extended. Although Scheib did receive notice the day of the telephone call this was too late to come within the Western Casualty doctrine; the purchase of the checks by Ryan was a transaction wholly between him and the bank. The lack of testimony relating to this $5,000 deal, supports this conclusion, for only vague references were made alluding to the conversation with Scheib on the $5,000 note. The only basis this court could predicate recovery for the $5,000 would be estoppel and the facts do not justify such a conclusion.

It is evident from the record of the trial that Scheib never intended his representations to include dead claims, for they offered no threat under the bond, nor was the surety unjustly enriched by such transactions. The surety owed no duty legal or equitable to pay those claims. 127 A.L.R. 974, 989-992.

Defendants in their brief refer to certain checks included within the $8,000 which Bower purchased and included in the $6,500 which Ryan paid out subsequently to the telephone conversation with Scheib, as not being properly allowable under the heading "material, or persons who shall supply him [the contractor] or the subcontractor with provisions, provender and supplies for the carrying on of the work."

At the trial of the action the defendants made a general objection to each group of checks on the ground they were irrelevant, immaterial, and incompetent. They did not cross-examine Ryan (who testified on direct examination that all of the checks in each respective bundle were, of his own knowledge made out for labor, supplies or materials) as to the purpose for which each check was drawn, nor did they make any objection to any specific check. The court in examining the checks did take it upon itself to question one check in the amount of $40 make payable to Reba Tebbs. The plaintiffs admitted that this check would not come within the scope of their theory of recovery and said it could be withdrawn.

This court has held repeatedly that a party complaining of error must stand or fall upon the ground relied on in the trial court. Fisk v. Cuthbert, 2 Mont. 593; Rutherford v. Talent, 6 Mont. 132, 9 Pac. 821; Thornton-Thomas Mercantile Co. v. Bretherton, 32 Mont. 80, 80 Pac. 10. The trial court did not have its attention called to the objection to which this court is now directed. Objections which are urged for the first time on appeal will not be considered by this court. Thornton-Thomas Mercantile Co. v. Bretherton, supra. Also objections to a series of documents as a whole are not well taken if some of them are admissible. Thornton-Thomas Mercantile Co. v.

Bretherton, supra; Edquest v. Tripp & Dragstedt Co., 93 Mont. 446, 19 Pac. (2d) 637.

It is obvious that the checks were competent, relevant and material evidence to be considered in the trial of the action. Since defendants did not feel it incumbent upon themselves to cross-examine or object specifically to the checks which they now feel should not be included within the judgment, their contentions fall within the rules enunciated in the above cases and are totally without merit.

The trial court erroneously included the $40 check to Reba Tebbs in the judgment to Bower, since plaintiff Bower admitted that this check did not come within the scope of plaintiff's theory of recovery, such an admission is binding and Bower's judgment should be decreased by subtracting the $40.

Defendants make the further contention that other checks included within the $8,000 should not be allowed because they were made out subsequent to February 17, 1950 (the date the defendants contend the telephone conversation with Scheib took place) and therefore could not have been the subject of conversation that day. Although all of the witnesses seemed unsure about the date, they eventually concluded by referring to it as February 17, 1950. However, there was no clear proof that it was the 17th, only that it was in the latter part of February. Ryan, Bower, Tebbs and Scheib did agree, however, that Bower held $8,000 worth of unpaid checks the date of the telephone call. The amount of unpaid checks held by Bower was uncontroverted and without dispute. This fixes the date, not the faulty memories of four witnesses four years after the date the conversation took place. We find no error in including those checks dated after February 17, 1950, in the judgment for Bower.

The last material contention of defendants was that rentals are not properly allowable as "provender, materials or supplies," under the bond. There seems to be a fair split of authority on that question. See 44 A.L.R. 381, and cases cited

therein. Examining those cases disallowing rentals for equipment used on the job, this court finds little justification for their rule, and therefore we hold that in this state the rule is that rentals are included within the coverage of this bond.

When a contractor rents a machine he rents the use of that machine, once used or operated so much life or use of the machine is destroyed—irretrievably lost. In this sense use of equipment is analogous to supplies which are consumed in the construction project. It is evident the statute and the bond are framed to protect those who rent machinery to contractors working on state projects in the same manner as they protect the laborer or materialmen. This court will not decide that the interests of one group are greater than the others, for both are equal in the eyes of the law.

We have examined the remainder of defendants' contentions and specifications of error, and find them without merit.

We therefore hold that judgment was properly entered covering:

1. Rentals on Ryan's equipment, $2,755;

2. Ryan's claim for labor performed in the amount of $454.76.

3. Ryan's claim for $6,500.

The judgment should be amended and modified in the following particulars:

1. The claim of $7,998.99 be decreased by $40, leaving a recovery of $7,958.99 for Bower.

2. The claim of plaintiff Ryan for $5,000 be disallowed.

The cause is remanded to the district court with directions to amend and modify its judgment to conform with this opinion, and as so amended and modified the judgment will be affirmed, each party to pay his own costs.

MR. JUSTICES CASTLES, BOTTOMLY and ANGSTMAN, concur.