THE STATE OF MONTANA, STATE HIGHWAY COMMIS-
SION OF THE STATE OF MONTANA, AND HARRY L.
BURNS, L. V. SWANSON, OTIS S. WATERS, S. N. HAL-
VORSON, AND ROY L. SORRELLS, AS MEMBERS OF AND
CONSTITUTING THE STATE HIGHWAY COMMISSION OF THE STATE
OF MONTANA, PLAINTIFFS AND APPELLANTS, *v.* JULIA VOY-
ICH, A WIDOW, OF LIVINGSTON, MONTANA, MILDRED VOY-
ICH, OF LIVINGSTON, MONTANA, DOLLY VOYICH, OF LIV-
INGSTON, MONTANA, AND DANIEL VOYICH AND JANE DOE
VOYICH, HIS WIFE, IF ANY, OF LIVINGSTON, MONTANA, DE-
FENDANTS AND RESPONDENTS.

No. 10415

Submitted March 15, 1963. Decided August 1, 1963.

Rehearing denied September 9, 1963.

384 P.2d 765

Daniel J. Sullivan, Robert Arthur Tucker, Helena (argued orally), Forrest H. Anderson, Atty. Gen., Helena, for appellants.

Landoe & Gary, Bozeman, Eugene I. Brown, Bozeman (argued orally), Arnold Huppert, Jr., Livingston, Hjalmer B. Landoe, Bozeman, (argued orally), for respondents.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal by the State from a judgment of the District Court of the Sixth Judicial District, Park County. The judgment was entered on a jury verdict in a condemnation action for interstate right of way. The taking of defendants' lands amounts to 17.64 acres. The judgment was in the amount of $32,275, the verdict having established the sum of $26,450 for the land taken, and $5,825 damages to the remainder.

Illustrative of the wide opinions of value contained in the record are these figures: Commissioners' award appealed by defendant property owners: $15,000 total, $6,864 for the land

taken and $8,136 for damages to the remainder; State's offer to landowner during negotiations $2,763.55, $971.50 for the land taken and $1,792.05 damages to the remainder; State's witness, a fee appraiser, $8,188, $6,864 for land taken and $1,324 severance damages; defendant property owner's witness as to different parcels, $6,000 per acre, $4,000 per acre, $1,500 per acre and $500 per acre, depending upon the part taken.

The 17.64 acres involved were for purposes of description, comparison, and valuation divided into parts.

Different values were assigned by witnesses to each parcel. For example, the witness Working assigned $4,000 per acre to one area, $1,500 to another and $500 to another. He gave his reasons for the differences and also the comparisons to other property hereinafter discussed.

The seventeen acre portion taken which gave rise to such a wide variation of value opinion was through a farm operation described by its owner as diversified farming and sale of gravel. The portion cut through a hill or ridge which lay contiguous to the developed residential area of Livingston. Part of it had what one witness described as a view of Paradise Valley "unsurpassed in the world", and a "magnificent" view of the Crazy Mountains and the mountains to the south of Yellowstone Canyon. It also had two commercial gravel pits, one in the area of the condemned portion and one away from it. From this gravel the Highway between Livingston and Bozeman Pass had been surfaced, gravel having been purchased by contractors as well as the State. As a farm operation, the portion was not of any unusual account, but the two factors, one as a residential development and second as a commercial gravel pit caused testimony of values as to parcels of the land far in excess of a normal farming operation. The area was not platted for residential purposes, nor was it deevloped, but the owner testified that residential development had been planned for some time prior to any thought of an interstate highway. Other testimony bore this out, at least as to its feasibility.

As described in appellant's brief:

"The evidence presented at the trial by the respondents, attempted to cover all aspects of value possible even though the use asserted was inconsistent with other testified uses. While it was shown that at the time of taking the property was operated as a cattle operation, yet testimony was allowed \* \* \* that it had a value for condemnation purposes as residential homesites, a commercial enterprise and as fill material \* \* \*. In addition, the homesite valuations asserted were supported by using as comparable sales the amounts paid by the State of Montana for properties under threat of condemnation. Further, this testimony was based upon assertions that the property was comparable even though its access was materially different, it was unplatted, and had neither sewer nor water facilities upon it while the other properties compared as similar contained these advantages."

Other and additional fact matters will be alluded to in our discussion of alleged errors.

Appellant cites as error seven matters and groups them for discussion. We shall do likewise as to grouping but shall consider them in a slightly different order.

Specifications of Error No. 3 and 4 are as follows:

"3. The court erred in allowing the introduction of testimony as to the amount paid by the State of Montana for property under threat of condemnation without a foundation being laid that such sales were (a) of comparable or similar property and (b) that such sales reflected a fair market valuation."

"4. The court erred in giving court's instruction number nine as follows:

" 'You are instructed that in arriving at the market value of the lands of the defendants here sought to be appropriated, you may take into consideration amounts paid by the plaintiffs in negotiated purchases of other lands in the vicinity of those of the defendants, so purchased by the plaintiffs for use in the construction of Interstate Highway No. 90.' "

In considering these specifications of error we feel constrained to limit our discussion to the particular manner and testimony produced, and to the particular grounds of objection made. That is to say, that our question is not as broad as the specifications quoted above might suggest.

A defense witness, Mr. Working, was qualified as a real estate dealer, land appraiser, and shown to have rather complete familiarity with the lands involved and the entire surrounding area. In laying a foundation for the introduction of opinions as to value for a higher use as of July 1, 1960, he described why and how he considered the Voyich lands, and the strip taken in particular, as being "readily adaptable as residential sites." To do so, described the lands, as to their character and location, and then compared them to other lands nearby. He described what we will call the "plus" features, the view, the slope, etc., and also the "negative" features, the lack of development of utilities, but their availability also. He also discussed access and distances. Then he was asked concerning specific properties, such as Star Addition, Swainson, Sprunger, Churchwell, Stump, Crissey, Werner. All of these properties adjoined the defendants' or were very near.

Working was cross-examined thoroughly, particularly as to what we have referred to above as the negative features, water, sewage, roads, and whether or not the defendants' property was platted. He conceded all the matters as negative, but demonstrated how he accounted for the difference in values.

It was during Working's testimony that counsel for the State first made its objection. The objections as reported are as follows:

"MR. TUCKER: Your Honor, I would ask that this testimony be stricken as being in the area of speculation. He is talking about this area being used as homesites when he has laid no foundation to show that it was available for homesites as of that date and his testimony also indicates that he is dealing in the area of speculation as to what it might be used for if it were

connected with water, and if it were attached to the City of Livingston. I believe there is no foundation for this type of testimony because it is speculation."

And again: "MR. TUCKER: Your Honor, I am going to renew my objection that I made before, that all of this testimony pertains to the nature of speculation as to what could be done with this property in the future if certain things were done, contingent things that have not been done as of July 1, 1960; and I would ask that all of his testimony in this regard be stricken and the jury be admonished to ignore it as being in a speculative and remote nature."

"MR. TUCKER: Your Honor, I would ask for a continuing objection to this line of testimony."

Then the State objected when the witness Poole was being examined as follows:

"MR. O'LEARY: Your Honor, understanding our position and our discussion before, we would at this time like to object that these properties being mentioned are not relevant to the property in question, and we would object on the grounds of irrelevancy and that there is no grounds that they are comparable sales to the subject property; and may we require a continuing objection to any evidence of this kind? * * *

"MR. O'LEARY: Your Honor, we object at this time on the grounds that there has been no comparability shown as to these files, and on the further grounds that in that point they are irrelevant and that a foundation is lacking in which there is any comparability shown."

It is seen then that the objection to the testimony was in the main as to the comparability of the neighboring lands; and not as to whether they were as State Highway Comm'n v. Peterson, 134 Mont. 52, 64, 70, 328 P.2d 617, 624, 627, lays down:

"The final test is the market value of the property being condemned. * * *

"The 'actual value' is the market value, 'the price that would in all probability result from fair negotiation, where the seller

is willing to sell and the buyer desires to buy.'" Citing State v. Hoblitt, 87 Mont. 403, 413, 288 P. 181, 185.

The gist of the appellant's argument on appeal is that comparable sales to a party having the power to condemn is inadmissible. Although, as noted before, the objections did not go specifically to this point, the questions of comparability of the *lands* involved and whether the comparable *sales* were such as to make the evidence factors to be weighed by the jury are so interwoven that we shall discuss the problem as it appears in this record.

As noted, witness Working detailed the comparisons of the Voyich lands with other lands purchased by the State. Then the witness Poole, a Highway Department employee in charge of right of way acquisitions, was called. He described the appraisal process used by the State, and was then asked specifically what price the State paid for lands adjacent to the Voyich lands. Interestingly, the State paid $4,000 per acre to several owners for lands, and up to $6,106.12 per acre. These figures were without any residual or severance damages though not identical with defendants' lands, neither were each identical with the other. The lands were all near or adjoining the west city limits of Livingston, and were suitable for residential use. The pattern of prices paid by the State was uniform, in other words, the comparable sales were not isolated compromise sales, but were as described by the witness Poole, negotiated by the State on the basis of approved appraisals by the State.

Poole described the negotiated purchases by the State as follows:

"This negotiation was made from an approved appraisal that was turned in before negotiation by a competent appraiser for negotiating purposes. These appraisals are made by either staff members or fee appraisers and they have looked into the area of comparables and considered all the sales in the area before making an appraisal, and they have found what they con-

sidered to be a fair and just market value of land to be purchased by the highway. These appraisals are then turned in to Helena to be reviewed, and if they are a good appraisal they are approved by a reviewing appraiser and sent to the field for negotiating purposes, and the negotiator is to negotiate on the appraisal furnished to him."

The similarity of the properties as well as the differences were gone into thoroughly.

This court has not previously ruled on whether or not evidence of sale prices paid by the State for other property on the same highway project under threat of condemnation is admissible. In State Highway Comm'n v. Peterson, supra, the court noted that evidence of a sale of land to the State was excluded without further comment. In the record in the Peterson case, the reason for the exclusion was that the sale, being under threat of condemnation, was not voluntary and thus was not a willing buyer to a willing seller on the open market. In that case, it was the State offering the evidence. In this case it is the defendant.

In State Highway Comm'n v. Bare, 141 Mont. 288, 377 P.2d 357, we noted that the best method of arriving at market value is the use of recent sales of comparable property.

In 118 A.L.R. 893, and 174 A.L.R. 395, and 85 A.L.R.2d 112, 163, appear Annotations on sales to prospective condemners. There it is said that the weight of authority is that such evidence is inadmissible. The reasons given generally are that the price paid under these circumstances is not a reasonable test of market value. In 174 A.L.R. 395, it is said "there is considerable disagreement with the view that evidence as to the price paid by a condemner for other land is inadmissible to prove the value of the land in controversy."

■■ We are not called upon, nor do we rule, on the question of admissibility of sales to condemners to establish market price. We have set forth sufficient here, though, to establish that upon the objections raised by the State, as heretofore

quoted, the District Court was not in error in allowing the evidence for the reason that the objection went to comparability of the lands, which comparability was shown. The rule is stated in Bower v. Tebbs, 132 Mont. 146, 160, 314 P.2d 731; Teesdale v. Anschutz Drilling Co., 138 Mont. 427, 357 P.2d 4, that a party complaining of error must stand or fall upon the ground relied upon in the trial court. And see State Highway Comm'n v. Yost Farms, 142 Mont. 239, 384 P.2d 277.

Next we consider Specifications of Error 1 and 2, which are:

"1. The court erred in allowing testimony to be introduced as to the value of the fill material in the property taken, since such was a value only to the condemner and not a criteria of fair market value.

"2. The court erred in allowing testimony to be introduced as to the value of the fill material in the property taken when such was not shown to be the highest and best use of the property."

There was testimony by defendants which showed two commercial gravel pits on their property as remarked before. One of the gravel pits was taken by the State. A contractor was allowed to testify that the market price for fill material such as here was $1,500 per acre. Now, this figure is considerably below, in the total, another and higher use as residential property discussed under the previous question where values of $4,000, $1,500 and $500 per acre was shown. The State argues that the only use as fill material shown is by the condemner, the State, and that the jury was allowed to hear testimony which might lead them to believe the State must pay both prices, viz., $4,000 per acre for residences and $1,500 per acre for gravel, the removal of which would destroy the residential use. The State argues that obviously the greater value destroys the lesser. This did not happen, though, as the jury award would have been higher. In addition, no objection was made

nor any instruction requested. For the same reason as in Specifications 3 and 4 above, this claimed error is without merit.

Finally, the State alleges error in instructions given as No. 3 and 6. They were:

"INSTRUCTION No. 3. You are instructed that the Fifth Amendment of the Constitution of the United States that provides that private property shall not be taken for public use without just compensation. Such compensation means the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property has not been taken."

"INSTRUCTION No. 6. You are instructed that just compensation for the taking and damaging of property means the payment of such sums of money as will make the defendants whole, so that upon the receipt by the defendants of the compensation and damages awarded, they will not be poorer by the reason of their property being taken or damaged."

The particular portion complained of is "will not be poorer by reason of his property being taken or damaged." The State argues that the instruction should have read "poorer or *richer*" rather than as it did. The State argues that this lack nullifies the fair market value test in that the jury has in effect a lower limit but not an upper limit. We think this to be a play on words. As said in State Highway Comm'n v. Peterson, supra, "Mere technical defects in instructions, if considered as a whole, do not render errors in instructions reversible error." We shall not quote Instructions 4, 6, 8, and 9, but note that reading the instructions as a whole, the measure of damages was fairly set forth as market value.

Finding no reversible error, the judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES JOHN CONWAY HARRISON and ADAIR, concur.