THE STATE OF MONTANA, Acting By and Through the STATE HIGHWAY COMMISSION of the State of Montana, Plaintiff and Appellant, *v.* WILLIAM J. WHEELER and BLANCHE V. WHEELER, Husband and Wife and as Joint Tenants, Farmer's Home Administration, Western Montana Production Credit Association et al., Defendants and Respondents.

No. 11084.

Submitted September 9, 1966. Decided October 21, 1966.

419 P.2d 492.

K.M. Bridenstine (argued), Helena, for appellant.

J. C. Garlington (argued), Missoula, for respondents.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an appeal by plaintiff from a verdict and judgment awarding the sum of $118,860 to the defendants for the taking and appropriation of 40.89 acres of land in a strip from east to west across the lands owned by defendants and situated in Missoula County. Instruction No. 14 specified that the jury could award defendants as high as $295,839.30, and no less than $27,922.00. The defendants own 867 acres of grazing and cultivated lands lying immediately west of Grant Creek approximately two miles west of Missoula. The land lies north of the Northern Pacific right-of-way and shares a common border with that facility on the south.

A general description of the land and its functions follows: Defendants employ the land for use in their cattle and pig operations. They also grow alfalfa, clover, orchard grass and grass to be used as hay for their livestock and for sale on the market. The land was irrigated by a complex irrigation pipeline and springler system which drew water from several wells on the land.

The building complexes of the ranch were situated in two locations: The home and ranch buildings proper are in the northwestern part of the land. Toward the east end of the property was the complex known as the "hog farm" which maintained the defendants' hog operation. Included in this hog farm were granaries, barn, fattening pens, corrals, and a modern home for a hired man and his family.

There were two access points to the defendants' property from the system of existing public roads. The usual and most convenient access was from the east, coming off the county road onto what is called Grant Creek Road. The other access

was from the west. This road came off U. S. 10 West, over what is known as "Clay Hill," across the Northern Pacific Railroad track, and onto the ranch.

The 40.89 acres of land taken is to be used by the public as the right-of-way for the location and construction of an Interstate Highway, consisting of four lanes in width and fully controlled access. This taking of defendants' land split the remaining land into two divisions; 432.69 acres, including the farm headquarters, are now on the north side, and 393.42 acres are on the south side of the highway.

The taking included, besides the grazing and cultivated lands, the hog farm buildings and the irrigation well situated nearby.

In addition the taking also destroyed part of defendants' farm road near the farm headquarters. A new road was built for the defendants which ran from the farm headquarters eastward. The road is parallel to and north of the new highway. Unlike the road which was destroyed, this road is a roundabout and burdensome route to Missoula. Further, it is not accessible to the new highway. One traveling this road must first go east to the county road. Then, once on the county road the traveler must go north and circle in an easterly direction before approaching the city.

With the building of the Interstate, the only way the defendants can get from one side of their property to the other side is now through a No. 192 underpass which was installed by the plaintiff through a written agreement dated November 6, 1964. For purposes of this appeal, it is important to note the dimensions of the underpass. The length of the underpass is 192 feet. The entrances to the structure are unfenced. A minimum cover of 6 feet is between the top of the underpass and the finished surface of the highway. The structure was planned and constructed with a 5 to 1 slope from north to south or a 20 percent grade climb. The extreme height of the arc is 14 feet 10 inches, and the span or extreme

width is 16 feet 2 inches. The flooring has plant mix oil on it, the same as is used to surface the highway. Before the oil mat was laid, the clear space of 12 feet at the bottom narrowed to 10 feet at the top. The bottom of the tube was elevated by the depth of the oil mat which was eventually laid. There is no evidence on record to show exactly what amount the bottom of the underpass was elevated. Except for a 4-wheel drive vehicle the slope of this underpass makes it impossible for general use by ranch vehicles carrying cattle, etc., so necessary because the ranch operations are severed by the Interstate Highway. There is a question of whether or not cattle could be taken from the north side to the south side areas safely during winter months when snow and ice could be in the tunnel. Unquestionably in considering whether or not the engineer gave any thought to its use, the jury determined the feasibility of the facility against the appellant.

The Clay Hill Road over the Northern Pacific Railroad tracks is the only road available for use on the south side of the highway. There is testimony to the effect that in the winter this road is very hazardous and is used only in necessity. The record shows that on either side of the hill the grade of incline is steep. The composite of the road is clay. When it rains or snows the clay becomes sticky, making the hill difficult as well as dangerous to negotiate.

Further, driving towards the farm home, once the traveler comes over the top of the hill he is immediately confronted with the railroad tracks and all its possible dangers. Going in the other direction toward U. S. 10 West a driver is faced with a decline in grade of 11 percent. If he should need to apply his brakes on the slippery clay he is very likely to slide directly onto the highway.

Also this road has a peculiar legal hazard surrounding its use. Since March 18, 1923, there has been on public record in Missoula County an agreement whereby the Northern Pacific Railroad granted the County of Missoula the Clay Hill crossing

over its tracks. In part, the agreement provided for a 40-foot wide strip across the 400-foot right-of-way upon certain terms including: "3. The Railway Company may upon ninety (90) days' notice in writing revoke this permit, and the grantee hereby agrees in that event to peaceably and promptly surrender possession of the premises unto the Railway Company."

To conclude the fact situation, it should be recorded that the City of Missoula is approximately two miles from defendants' property. Its growth has taken gigantic steps in the past several years, making defendants' land highly desirable for urban development. Expert testimony on record shows that this property would be useful for subdivision for both industrial and residential purposes.

The appellant sets forth some eleven specifications of error which are:

(1) The court erred in ordering, in Preliminary Order of Condemnation, that plaintiff at its expense, install, construct and maintain the Design No. 192 underpass tube at Station 1336 on subject project;

(2) The court erred in refusing plaintiff's testimony as to the cost of installing and constructing the tube, Design No. 192, ordered by the court in its Preliminary Order of Condemnation;

(3) The court erred in permitting the testimony of witness Vernon Peterson, over objection of plaintiff, as to the effect of the Interstate Highway routing west of Missoula, Montana, on the market price of land in the area;

(4) The court erred in permitting the testimony of witness Vernon Peterson, over plaintiff's objection, of a proposed but never established subdivision of a portion of the subject property;

(5) The court erred in refusing plaintiff's Motion to Strike the testimony of Vernon Peterson as to the effect upon the market value of the property of the Interstate construction and the proposed subdivision testimony;

(6) The court erred in excluding evidence from witness Oscar Ostenson concerning plaintiff's improving the "Clay Hills" access or west access to United States Highway No. 10, and in refusing plaintiff's Offer of Proof;

(7) The court erred in admitting the document into evidence that was the easement from the Northern Pacific Railway Company to the County of Missoula and which concerned the railway crossings of the Grant Creek Road and the "Clay Hills" access on the west of subject property;

(8) The court erred in permitting the testimony of witnesses Crouse and Fick concerning the Northern Pacific easement;

(9) The court erred in failing to follow correct and prescribed procedure for the answering of a question by the jury after the jury had been charged and was in session deliberating upon their verdict;

(10) The court erred in answering the question of the jury during their deliberations by the following answer:

"Q. Does Mr. Wheeler have the right to take the pump for water, buildings and other equipment after the trial is over? Jury"

"A. Sorry. No answer."

(11) That the court erred in not granting a new trial to plaintiff.

Specifications of error Nos. 1 and 2 will be considered together due to the fact that they relate to the underpass.

It is appellant's contention that the court erred in the preliminary Order of Condemnation in ordering appellant to pay for the underpass in question and in failing to consider appellant's evidence as to the cost of same. To put the appellant's specification in another light, the respondent rancher whose property is cut in two should bear the expense. Regardless of how the specification reads we find no merit to appellant's contentions.

Here the appellant by its action takes a 6,600 foot strip from the respondent through the middle of his ranch. It denied the main access route to the ranch. The district judge in his findings of fact and conclusions of law of November 17, 1964, quite properly considered the effect of the bisecting highway to the ranch operations in directing that the underpass be built. This the district court can properly do under the provisions of section 93-9911(1), R.C.M.1947. The courts of this state are by statute charged with the duty of protecting private property both from the eager slide rule of the engineer-architect and the arbitrary decision of an administrative board that enforces his action. Section 93-9911(1), R.C.M.1947, must be read with the companion reference section 93-9904(5), R.C.M.1947, which provides:

"5. All rights of way for any and all the purposes mentioned in section 93-9902, and any and all structures and improvements thereon, and the lands held and used in connection therewith must be subject to be connected with, crossed, or intersected by any other right of way of of [sic (or)] improvements, or structures thereon. They must also be subject to a limited use, in common with the owner thereof, when necessary; *but such uses, crossings, intersections, and connections must be made in manner most compatible with the greatest public benefit and least private injury * * *.*" Compare State Highway Commission v. Yost Farm Co., 142 Mont. 239, 384 P.2d 277.

Further it should be noted that the appellant had agreed on November 6, 1964, to "install at Highway Station No. 1336, its design No. 192 underpass * * *." With that the matter seemed closed for it did not appear at time of trial. However, the appellant now wants this court to consider the matter on appeal raised for the first time since the findings and Order of Condemnation. Appellant raises the point too late. Rule 2, M.R.App.Civ.P. is as follows:

"Upon appeal from a judgment, the court may review the

verdict or decision, and any intermediate order or decision excepted or objected to within the meaning of Rule 46 of the Montana Rules of Civil Procedure, which involves the merits, or necessarily affects the judgment, except a decision or order from which an appeal might have been taken."

Touching lighting on specification 2 that respondent should pay for the underpass in that it is a "benefit" to him, the respondent in his brief says "to examine this strange and unrealistic contention," we would also add fantastic. Had not the underpass been constructed it can be well argued that this verdict could have been considerably more, for the agreement entered into by the State had the effect of reducing the depreciation to the lands north of the highway—the lands upon which the ranch buildings were located. If there is any benefit to the parties in this underpass it goes to the appellant not the respondent.

Specifications 3, 4, and 5, can be consolidated for purposes of this discussion. This goes to the competency of witness Peterson to testify as to the market price of the land, as to the lands' use as a subdivision, and the effect upon market value of the property.

Mr. Peterson, respondent's witness, was not just an ordinary lay witness. He was a county surveyor for ten years, was a licensed civil engineer since 1949; has engaged in engineering work doing "land development." In addition he served as President of a City-County Planning Board for three years and as such duties of the Board included:

"* * * prepared a land use and master plan for the jurisdictional area and in preparing that we hired a consulting firm that does that type of work, and it was prepared for land use and subdivision regulations and zoning ordinance and were so formed."

In view of the testimony given concerning this project by the appellant we can think that sufficient foundation was given for Mr. Peterson to testify as he did. This court said in

State Highway Commission v. Peterson, 134 Mont. 52, 328 P.2d 617.

"* * * Evidence may be introduced as to the various uses to which the property is adapted, even though it has never been put to such use in fact. In this connection the location of the land, the character of the neighborhood, and all things surrounding the property may be shown as all are matters which a purchaser would consider in attempting to ascertain the market value. Here, it must be borne in mind the ultimate inquiry is the market value. To arrive at the market value, however, it is always proper to introduce evidence as to the uses to which the land may be put, as well as the uses to which it has been put, for a witness to detail its adaptability for a particular use, and then to state its market value. The use is not the market value. However, the use should be considered in arriving at the ultimate inquiry, the market value itself." See also State Highway Commission v. Voyich, 142 Mont. 355, 384 P.2d 765; 29A C.J.S. Eminent Domain § 160, p. 688.

The district court quite properly allowed this testimony and we find no error.

█ We will combine for discussion appellant's specification of errors, 6, 7, and 8, which went to the exclusion of certain testimony concerning the west exit known as the "Clay Hill Road."

As has been previously set forth in the statement of fact this west entrance or exit road is a dangerous road. Prior to the Interstate's arrival it was not often used by respondent, but with the cutting off of the eastern access road it became important to the case. The respondent testified that the road was not safely useable during the winter months, or during rainy seasons due to both the grade of 11 percent and the clay content of the road. Too, he testified as to the dangerous condition of a railroad crossing on the road. In the course of the testimony the respondent objected to, and the court sustained, the following question:

"Q. Mr. Ostenson, in connection with that approach, have you devised any changes which you at this time as District Engineer are authorized or willing to authorize immediate work to commence on that that will change the approach from the highway to the railroad tracks in any way?

"MR. GARLINGTON: Objected to as incompetent, irrelevant, and immaterial, not being a matter that is alleged or contained in the pleadings in this case, without foundation laid as to authority to make any commitment, as being indefinite and conjectural and as being contrary to the statute defining the date as of which value in this case is to be determined."

We find no error in the court's ruling as to this testimony, to which respondent made a proper objection. The trial court and this court are bound by section 93-9913, R.C.M.1947, which provides that value and depreciation as of the date of service of summons is the measure of compensation for all property to be actually taken. Testimony must be restricted to the measure of compensation as of the date of service of summons in a condemnation action. That date here was August 26, 1964.

Concerning the admission of the Northern Pacific Railroad easement in evidence we find no error. As previously pointed out this easement concerns itself with the western access referred to as the "Clay Hills" exit, without which the respondent would have no access to or from the west area of the ranch. The document in question shows that the Railroad Company could cancel the easement on a 90-day notice to the County of Missoula and was introduced during rebuttal by respondent. Appellant objected on the grounds it was improper rebuttal, surprise, and that it in no way changed the situation as the date of taking shall control, as provided by section 93-9913, R.C.M.1947, and that the document was highly prejudicial and speculative in nature and therefore should have been excluded.

As stated by respondent: "Why or how the solid, written,

publicly recorded truth should be prejudicial to the State, or be speculative, is not made clear." We agree.

Here the appellant in order to show public access to the highway presented two appraisal witnesses to show there was access at the "Clay Hills" exit, and therefore, there could be no loss of commercial usefulness. It was quite proper and necessary to rebut this testimony and to let the jury know the type of easement provided for the "Clay Hills" road. In answer to alleged surprise we might observe that the State's appraisers had or could have had with diligent research the very public record introduced by respondent. We find no prejudice to the appellant in the court's rulings.

Specifications Nos. 9 and 10 go to the handling of a question, by the jury to the Court, concerning the salvage of a water pump, buildings and other equipment resulting from the taking of the hog farm, which question was:

"Does Mr. Wheeler have the right to take the pump for water, buildings and other equipment after the trial is over? A. Sorry, no answer."

This came some three hours after deliberations began. Counsel were called to Judge Glore's chambers, it was read, and Judge Glore ruled over appellant's objections as set forth above. The jury was never brought into court.

It should be noted that respondent had testified, without objection, that he would be given the pumps, pipes, buildings, corrals or other material if he cared to take the trouble to salvage same. We need not determine whether the district court erred in the handling of this matter. Section 93-5106, R.C.M.1947, clearly sets forth the proper procedure in matters such as this, as follows:

"After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony, or if they desire to be informed of any point of law arising in the cause, they may require the officer to conduct them into court. Upon their being brought into court, the in-

formation required must be given in the presence of, or after notice to, the parties or counsel. Such information must be given in writing or taken down by the stenographer."

It should be noted that under the provisions of section 93-5106, the jury *may* request that they be brought into court. This is not mandatory and the method used here is commonly practiced in sending an inquiry out to the court. Here Judge Glore had both attorneys in his chambers; he read the inquiry to them and gave them his answer. While appellant objected to the procedure he did not request that the jury be brought into the courtroom rather the stress of his objection went to the form of the answer. While not necessarily approving the court's answer as submitted to the jury, we cannot read into it prejudice to appellant. After carefully reviewing the entire record we do not feel it of such import as to require a retrial because of the court's answer.

We find no merit in appellant's eleventh and final specification. Clearly here is a case where neither side is satisfied. The State's appraisers differed as to the value of respondent's property with a low of $128,000 and a high of $250,000. Their estimates of damages run from $27,000 to $38,000. The respondent appraiser placed a value on the property before the taking at $502,000 and his estimate of just compensation at $295,839.30. The jury verdict was for $118,860.00. We find no error.

The judgment of the district court is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON, MR. JUSTICES ADAIR and CASTLES, and DISTRICT JUDGE L. C. GULBRANDSON, sitting in place of MR. JUSTICE DOYLE, concur.