No. 80-109

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

---

NANCY McALPINE, Individually and as
Personal Representative,

Plaintiff and Appellant,

vs.

MIDLAND ELECTRIC CO., and THE STATE
OF MONTANA,

Defendants and Respondents.

---

Appeal from: District Court of the Eighth Judicial District,
In and for the County of Cascade.
Honorable H. William Coder, Judge presiding.

Counsel of Record:

For Appellant:

Hoyt and Trieweiler, Great Falls, Montana
John C. Hoyt argued, Great Falls, Montana

For Respondents:

Cure and Borer, Great Falls, Montana
Edward Borer argued, Great Falls, Montana
Marra, Wenz, Iwen & Johnson, Great Falls, Montana
Joseph Marra argued, Great Falls, Montana

---

Submitted: June 9, 1981

Decided: September 28, 1981

Filed: SEP 29 1981

*Thomas J. Kearney*

Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Daniel McAlpine was killed in an automobile accident on April 27, 1975. His widow, Nancy McAlpine, filed a wrongful death action against Roger Dahl, Midland Electric Company, and the State of Montana. Summary judgment was entered in favor of all three defendants in May 1977. Nancy McAlpine appealed, and this Court reversed the orders granting summary judgment. Dahl settled with McAlpine, and trial was had as to the remaining defendants in November 1979. On December 1, 1979, the jury returned verdicts for Midland Electric Company and the State of Montana. Plaintiff McAlpine filed combined motions to set aside the jury verdict and for a new trial on the issue of damages only. The district judge refused to grant the relief sought by McAlpine, and she appeals. We reverse.

On Sunday, April 27, 1975, Arthur Krueger was driving a one-ton pickup with a gooseneck fifth wheel trailer westward on a two-lane stretch of Highway 89 near Great Falls, Montana. Krueger was a job foreman for Midland Electric Company of Billings, Montana, and the vehicles belonged to Midland. At about 9:30 p.m., a wheel came off of the left side of the trailer. The trailer was immobilized and blocked the westbound lane of traffic. Krueger had no warning devices, but was given three reflectors by passersby. These were placed behind the trailer to the east. A short time later Highway Patrolman James Coey arrived. Coey radioed for a wrecker and Dahl's Wrecker Service dispatched a vehicle. Coey stayed on the scene for about one-half hour, but left before the wrecker arrived. Coey did not place any warning devices upon the highway, but gave Krueger two fusees before departing. He left in order to assist a fellow officer in the apprehension

of a suspect on a bad check charge. The other officer had not requested assistance.

Coey passed the Dahl wrecker on the highway and instructed Dahl over the radio that the trailer should be towed to an approach 300-400 feet east of where it had come to rest. Dahl hooked his wrecker to the left rear of the trailer (the side without wheels). This put the Dahl wrecker in the westbound lane of traffic but facing in an easterly direction. Dahl's clearance lights, four-way flashers, rotating beacon and work light were all in operation. The Midland vehicle's clearance lights and flashers were on. There were fusees and reflectors on the roadway to the east. Ronald Mammen, Dahl's stepson, was standing in the highway alongside the trailer holding a flashlight with a yellow hazard light on top. Dahl began towing the disabled fifth wheel trailer in an easterly direction but in the westbound lane. Krueger was in the pickup, driving it in reverse. They were traveling at a very slow speed.

At this time the vehicle owned by Daniel McAlpine approached the scene. McAlpine was a farmer/rancher from Sunburst, Montana. He had spent the day at Stanford, Montana, attending a bull sale. Michael Hofer had accompanied him to the sale. Hofer had moved to the McAlpine ranch two days before the accident. He had been hired to help with spring planting. Whether he had begun work was a trial issue. At trial two witnesses testified to seeing both Hofer and McAlpine consume alcohol at different locations in Stanford after the bull sale. Two other witnesses testified that the McAlpine vehicle passed them at a high rate of speed and was being driven in an erratic manner. Roger Dahl and Ronald Mammen testified that the McAlpine vehicle approached the disabled vehicle at a high rate of speed and did not appear

to slow down. When the McAlpine vehicle reached the wrecker, it passed to the right of it but struck the right rear corner of the Midland trailer. Michael Hofer, who was driving, and Daniel McAlpine were killed instantly. Hofer died with a beer can between his legs. There were empty beer cans in the vehicle. Hofer's blood alcohol level was .09, McAlpine's .14.

Nancy McAlpine brought suit and judgment was eventually entered for defendants Midland Electric Company and the State of Montana. Because we are reversing the judgment, we will only address those issues that are likely to reemerge if the case is retried:

1. Was it error to admit the blood alcohol tests of Hofer and McAlpine?

2. Were the results of the blood alcohol tests inadmissible because their proponents failed to establish a foundation which would assure their trustworthiness?

3. Did the District Court commit reversible error by improperly instructing the jury on the issue of contributory negligence?

I.

Appellant McAlpine bases her argument on this issue upon the restriction of the Uniform Accident Reporting Act. That Act contains the following language at section 61-7-114, MCA:

> "Accident reports confidential. (1) All required accident reports and supplemental reports shall be without prejudice to the individual so reporting and shall be for the confidential use of the division or other state agencies having use for the records for accident prevention purposes, or for the administration of the laws of this state relating to the deposit of security and proof of financial responsibility by persons driving or the owners of motor vehicles, except that the division may disclose the identity of a person involved in an accident when such identity is not otherwise known or when such person denies his presence at such accident.

-4-

"(2) All accident reports and supplemental inform-
ation filed as required by this part shall be
confidential and not open to general public inspec-
tion, nor shall copying of lists of such reports
be permitted, except, however, that the report and
supplemental information filed by law enforcement
personnel, as required by this part, may be examined
by any person named in such report or reports or by
any driver, passenger, or pedestrian involved in the
accident or by his representative designated in
writing, or if such person shall be deceased, by
his executor or administrator or by the attorney
representing such executor or administrator.

"(3) No such report shall be used as evidence in
any trial, civil or criminal, arising out of an
accident, except that the division shall furnish
upon demand of any person who has or claims to have
made such a report or upon the demand of any court
a certificate showing that a specified accident re-
port has or has not been made to the division solely
to prove a compliance or a failure to comply with
the requirement that such a report be made to the
division."

The blood alcohol percentages of the accident victims
were brought before the jury in the form of the laboratory
analysis reports of both the Michael Hofer and Daniel McAlpine
blood samples. Appellant did not raise the prohibitory
language of section 61-7-114, MCA, in her objection to the
admission of these reports. Normally, the party complaining
of error must stand or fall upon the ground relied upon in
the trial court and objections which are urged for the first
time on appeal will not be considered by this Court. Bower
v. Tebbs (1957), 132 Mont. 146, 160, 314 P.2d 731, 739.
Nevertheless, this Court has a duty to determine whether the
parties before it have been denied substantial justice by
the trial court. This Court can, within its sound discretion,
consider whether the trial court has deprived a litigant of
a fair and impartial trial, even if the parties ignored the
mandate of a statute or an established precedent. Halldorson
v. Halldorson (1977), 175 Mont. 170, 573 P.2d 169; Kudrna
v. Comet Corp. (1977), 175 Mont. 29, 572 P.2d 183. If the
prohibition of section 61-7-114, MCA, should have been

-5-

applied to the blood test results of Hofer and McAlpine, it would have been plain error to allow the tests into evidence despite the lack of a specific reference to the statute in the objection. In order to determine if the appellant has been denied substantial justice, we will consider whether section 61-7-114, MCA, mandates exclusion of this evidence.

Clearly, any reports required by the Uniform Accident Reporting Act, section 61-7-101 et seq., and any reports which supplement the required reports are not admissible in court. However, the blood test result forms themselves were admitted below. We conclude that the blood test results are not required or supplemental accident reports as contemplated by the statute. The information they disclose relates solely to the testing of blood from an individual. The forms do not provide for reference to the occurrence of an accident or the conditions existing at the time of the occurrence of an accident. Further, the forms contain a "Notification of Rights" which states in part that: "Prior to my voluntary consent to give a sample of body substance for chemical analysis, I was informed . . . 3. That the results of the chemical analysis of the body substance, given by me, might be used against me in a court of law. 4. That any admissions I make, or any information contributed by me, may be used against my interest in a court of law." The "Notification of Rights" clearly indicates that the lab test form is not a required report to which a guarantee of confidentiality was meant to attach. In addition, the language of section 61-7-109(2), MCA, shows that the lab test result forms are not supplemental reports required under the statute: "The division [of motor vehicles] may require any driver of a vehicle involved in an accident of which report must be made as provided in this section to

file supplemental reports whenever the original report is insufficient . . ." The lab test result forms are not addenda used to complete a prior insufficient report, nor were they required of a "driver of a vehicle involved in an accident." They are not "supplemental reports" and were not excludable by reason of section 61-7-114, MCA.

Despite our conclusion that the lab report forms which were admitted were not required reports, we must still concern ourselves with cases cited by appellant which hold that that which goes into a report required by the Uniform Accident Reporting Act is as inadmissible as the report itself. Courts which so conclude generally follow the reasoning of cases such as Cooper v. State (Fla. Dist. Ct. App. 1966), 183 So.2d 269, 272.

> "There can be no question but that the taking of the blood sample was intended as a part of the investigation for the purpose of completing the report, required of the officer. Further, it was at the insistence and request of the officer that the doctor took the blood sample. This blood sample formed a basis, or at least a portion of the basis for the officer's written report. If the report was inadmissible . . . then the information obtained by whatever method, if obtained for the purpose of making the report speak the facts, was inadmissible." (Emphasis in original.)

We will not construe section 61-7-114, MCA, in the same manner as the Florida court. The reasoning of Cooper could, if taken to the limits of its logic, require the exclusion of any information, regardless of its source, which contributed to the completion of a required report. We cannot accept such a broad application of the statutory exclusion. It has been held in California that:

> "[The Vehicle Code] requires the driver of a vehicle involved in an accident . . . to cause a written report to be made . . . [and] provides that no such report shall be used as evidence in any trial arising out of such accident. But it was not a report so provided to be made that was offered . . . No evidence of the facts that occurred at the time of a vehicular accident is privileged. Only those

reports are confidential which are so made by [the Code]. To make a statement privileged and inadmissible it must come within the express terms of the section." Stroud v. Hansen (1941), 48 Cal.App. 2d 556, 559-560, 120 P.2d 102, 104. (Stroud also contained language relative to contributory negligence instructions. That language was "disapproved" in Cummings v. County of Los Angeles (1961), 56 Cal.2d 258, 268, 363 P.2d 900, 906, 14 Cal.Rptr. 668, 674. The decision in Cummings did not involve the question of the admissibility of accident reports.)

The fact that the accident victims had consumed alcohol was entered upon officer Coey's accident report. Although the exact figures from the lab tests were not written into Coey's report, the figures formed a basis for the completion of his report. (We note that plaintiff sought to have this required report admitted in spite of the reference to the consumption of alcohol. Defendants successfully prevented its admission by raising the statutory prohibition now in question.) Even though the lab test results formed a portion of the basis for the completion of the officer's report, the lab test result forms were not required reports. We adopt the reasoning of the California court, and hold that lab reports of blood alcohol analyses are not inadmissible by reason of the prohibition of the Uniform Accident Reporting Act.

II.

Appellant argues that even if the Uniform Accident Reporting Act does not bar introduction of the results of the blood alcohol tests, the results were still inadmissible because they lacked a proper foundation. Appellant claims that the respondents:

1. failed to show that post-mortem blood clotting did not result in a higher blood alcohol reading;

2. failed to show that the procuring and testing of the samples followed the procedures set out in the Administrative Rules of Montana;

-8-

3. failed to show the blood tested came from the victims' bodies; and

4. failed to produce the gas chromatograph records used to achieve the test results.

A review of the testimony will aid in our resolution of this issue.

Mortician Ray Fischer testified that he drew the Hofer sample. He knew that it was Hofer because of what he was told at the hospital and because he called the Hutterite colony at which Hofer had been raised for permission to embalm. He used the carotid artery and internal jugular vein and drew a sample from the right ventricle of the heart. He filled a 30 milliliter sample bottle with blood. No embalming had yet been done. The sample was drawn with a stainless steel tube that comes apart for sterilization. Fischer testified that the sample was a representative and uncontaminated sample, and that the blood serum had not separated from the cells. Fischer gave the sample to Highway Patrolman Richard Zaharko, who had waited in the funeral home lobby while the sample was drawn. Zaharko completed the forms that accompany the sample bottle, placed the bottle in the mailing container, and sealed and mailed the container.

Mortician Leslie Patzer did not have an independent re-collection of having drawn the McAlpine blood sample. However, he was the only person at his funeral home who took blood samples. He employed standard blood drawing procedures each time he drew blood. He was fairly certain that none of the disinfectant used to clean his instruments would have contaminated the McAlpine sample. Patzer also gave his sample to patrolman Zaharko.

Patrolman Zaharko testified that he had picked up the samples from the morticians, received information from them

necessary to fill out the forms, sealed the samples in the presence of the morticians, and mailed them to the lab.

Richard Paulsen is a field health officer for the Montana Department of Health and is also a certified operator-supervisor of gas chromatography. Paulsen testified generally as to procedures used in alcohol testing. He stated that the gas chromatography test can distinguish between different types of alcohol and can also distinguish substances such as embalming fluids. Paulsen stated that the sample bottles contain an anticoagulant which prevents clotting, but that if clotting occurred it would be broken up before testing. Paulsen tested the Hofer and McAlpine samples and found the blood alcohol contents to be .09 percent and .14 percent respectively.

It was not until the testimony of these four witnesses was presented that the blood alcohol test results were admitted into evidence. We now turn to our analysis of what appellant urges to be the inadequacy of the foundation for the test results.

First, appellant contends that respondents did not show that post-mortem blood clotting did not seriously affect the test results. Appellant brought no evidence to support this contention. Appellant did not challenge respondents' witnesses by reference to treatises which supported appellant's theory as to changes in the blood alcohol content. At most, appellant laid the basis for a suggestion that a change in the blood of the victims occurred between the time of death and the time the blood was drawn. Such a suggestion goes to weight, not admissibility. The lapse of 9 to 12 hours between death and sampling, without proof of its effects, did not render the test results inadmissible.

Appellant next maintains that respondents did not show that there was adherence to the procedures for blood testing outlined in section 16-2.26(1)- S2600, Administrative Rules of Montana (ARM), (now section 23.3.931, ARM). The procedures established in the administrative rules implement section 61-8-405(6), MCA. That code section provides for the administration of blood tests of persons arrested for driving while under the influence of intoxicating liquor. Under section 61-8-401, MCA, a presumption of being under the influence of alcohol may arise if a defendant's blood alcohol reaches a certain level. This presumption may be used in an effort to convict a person of the charge of driving while intoxicated. A criminal defendant is entitled to the procedural safeguards provided by the ARM before such a presumption is applied. It does not follow that the same safeguards must be employed when blood test results are used in a civil case.

This is especially true where, as in the case before us, the statutory presumption was not relied upon. In Bach v. Penn Central Transportation Co. (6th Cir. 1974), 502 F.2d 1117, the court held that the statutory presumption of the "driving while under the influence" law did not apply in civil cases. That court went on to say that where the statutory presumption is not applied, ". . . evidence of blood alcohol concentration in appropriate cases should be received like any other expert testimony. The test procedures need not necessarily conform to those described in the statute, but they must accord with good practice in the field to assure reliable results." Bach, 502 F.2d at 1121. The testimony of respondents' witnesses established that the procedures employed followed good practice in the field. We hold that it was not error to fail to prove compliance with section 23.3.931, ARM.

The appellant's third contention on foundation, that there was a failure to prove that the samples came from the victims, consists of little more than a selective presentation of the testimony below. Both morticians had no doubt that the samples were from the victims of this accident. We find no merit in this argument.

Finally, appellant maintains that she was harmed because the laboratory technician who tested the samples did not produce the graphs made by the gas chromatograph when he testified at trial. Appellant claims that this violates Rule 1002, M.R.Evid.: "To prove the content of a writing . . . . the original writing . . . is required . . . except as otherwise provided by . . . these rules." The lab test result form was admitted into evidence. It was completed by the lab technician who first ran the test, ascertained the graph readings, and then completed the form. Thus, the results as written on the forms were copies of entries in the regular course of business. "A copy of an entry in the regular course of business consists of an entry in a writing kept in the regular course of business copied from another such writing by manual or mechanical means at or near the time of the transaction." Rule 1001(5), M.R.Evid. The lab test result forms were admissible as copies in lieu of the graph under Rule 1003, M.R.Evid.: "A duplicate, or copy of an entry in the regular course of business as defined in Rule 1001(5), is admissible to the same extent as an original." Rule 1003 contains three exceptions to admission of a copy, none of which apply here. It was not error to allow the lab test result forms into evidence without the graph.

In summary, we hold that none of the appellant's issues concerning improper foundation constitute error.

III.

We find that the District Court committed reversible error by submitting its contributory negligence instruction to the jury. The court's instruction no. 33 read as follows:

> "Under the law of the State of Montana, a passenger, or one who is riding in a motor vehicle driven by another may be guilty of contributory negligence in riding in an automobile which is driven by an individual under the influence of intoxicating liquor, if you find that the driver's intoxication contributed to some degree as a cause of the accident."

The statement that the driver's (Hofer's) intoxication must have "contributed to some degree as a cause of the accident" totally fails to state the essential proximate cause element of contributory negligence. Before Montana adopted the doctrine of comparative negligence, this Court set down the rule that for contributory negligence to be available as a defense, the negligence of the plaintiff must have been a proximate cause of the injury. Wolf v. Barry O'Leary, Inc., (1957), 132 Mont. 468, 318 P.2d 582; Dimich v. Northern Pacific Railway Company /(1959), 136 Mont. 485, 503, 348 P.2d 786, 795; (Harrison, C.J. dissenting); Leichner v. Basile (1964), 144 Mont. 141, 394 P.2d 742; Sztaba v. Great Northern Railway Company (1966), 147 Mont. 185, 411 P.2d 379. "Contributory negligence by definition in Montana includes 'proximate cause', and this strict formula does not tolerate any less or remote 'contribution' by the plaintiff. Plaintiff's conduct must not only 'contribute' to the injury but must contribute as a 'proximate cause.'" DeVerniero v. Eby (1972), 159 Mont. 146, 152, 496 P.2d 290, 293. (Emphasis in original.) "We have always adhered to the strict formula of 'proximate cause'. No less formula will suffice to give the jury a correct instruction on contributory negligence." Wolf, 318 P.2d at 585. The misstatement of proximate cause misled the jury and thereby prejudiced the plaintiff. The fact that the jury was misled is brought out by an examination of the

court's instruction no. 28.

No. 28 stated that:

"You are instructed that:

"If you find that Michael Hofer was negligent, but that his negligence, if any, occurred without awareness of the danger, adding to existing peril, his conduct is said to concur with the defendants' negligence, if any, in proximately causing the loss. If you find that Hofer saw or should have seen the danger and negligently failed to avoid it, his conduct is held an unforeseeable, intervening cause (superseding cause) cutting off liability of the defendants."

The jury foreman submitted the following question to the judge: "We have a question on instruction no. 28. If we agree Hofer should have seen the danger does that cut off liability of the defendants entirely?" The judge replied that "[y]ou are not to single out any certain sentence or any individual point or instruction, and ignore the others, but you are to consider all the instructions as a whole, and to regard each in the light of all the others." The foreman's question indicates that the jury was concerned with the causal link of Hofer's conduct. While we do not criticize the district judge's response to the foreman's question, referring the jury to the other instructions would of course lead them to no. 33. That instruction allowed the jury to find the defendants not liable if Hofer's conduct "contributed to some degree as a cause of the accident." The jury was allowed to base their verdict upon a standard other than the true standard of proximate cause. Failure to properly state this essential and well-settled element of the defense of contributory negligence was prejudicial to the plaintiff and reversible error.

We note for the benefit of the trial court that instruction no. 28 should not be given in a retrial of this case. It is both confusing and a misstatement of the law. We are unable to determine what the first sentence of the instruction is

supposed to mean. The second sentence purports to be a statement of intervening cause, but it, like no. 33, fails to state that Hofer's conduct must have been a proximate cause of McAlpine's injuries.

Plaintiff argued that she was entitled to sanctions because of an improper closing argument concerning the amount of the settlement with Dahl. The argument was not proper. The jury was instructed that it should not concern itself with the settlement as the court would take care of that if the jury found damages for the plaintiff. In the course of final argument, counsel for defendant stated that Roger Dahl had paid for his share of the accident and that should end it. Such argument went outside the instructions and should not be permitted in a retrial.

The judgment is reversed and the cause remanded for a new trial.

_____
                Justice

We concur:

_____
        Chief Justice


_____


_____


_____
            Justices

Mr. Justice Frank B. Morrison, Jr., specially concurs to the majority opinion.

I concur in the result. However, instruction no. 33 is defective for reasons not referred to in the majority opinion.

The subject instruction allows the jury to find the passenger guilty of contributory negligence if the driver's intoxication contributed to the cause of the accident. This is not the law. A passenger can only be defeated if the passenger, knew or should have known, that the driver was intoxicated. The driver's intoxication, standing alone, cannot defeat recovery on the part of the passenger.

The error in this instruction goes to the heart of this case and is highly prejudicial. The blood alcohol reading of the driver was found to be .09. Such a reading is in the "gray area". The driver may well have been under the influence of an intoxicant, but yet not give any indication of that influence to the passenger. The driver's impairment must be observable to a reasonably prudent person. If a reasonably prudent person would not be able to detect the driver's intoxicated state, then that person cannot be denied recovery on the basis of contributory negligence. It is obvious from the facts of this case that the jury could have found the driver to be under the influence and denied recovery to the passenger without the requisite finding that the passenger was himself guilty of failure to exercise reasonable care.

In my opinion this instruction cannot be cured by changing its definition of "proximate cause".

_____
                        Justice

I concur in the special concurrence.

_____
John C. Sheehy

I join in the majority opinion, but also agree with Justice Morrison as to why it was error to give Instruction No. 33.

_____
Justice

I Would Affirm
_____
Justice